The People of the State of Illinois, Plaintiff-Appellee, v.
George Bravos, et al., Defendants-Appellants.

Gen. No. 52,545.

First District, Second Division.

September 9, 1969.

Rehearing denied October 7, 1969.

300

Bellows, Bellows & Magidson, Frank G. Whalen, Harry J. Busch, and Michael Brodkin, of Chicago, for appellants.

Edward V. Hanrahan, State's Attorney of Cook County, of Chicago (Elmer C. Kissane, James B. Haddad, James R. Kavanaugh, and Michael D. Stevenson, Assistant State's Attorneys, of counsel), for appellee.

MR. JUSTICE McCORMICK delivered the opinion of the court.

The defendants, George Bravos, Joseph Lombardi, Sam Mercurio and William Messino, were tried jointly before a jury. A five-count indictment had been returned, Count I of which charged that the four codefendants (and two others subsequently acquitted) conspired in agreeing to intimidate Jack, George and Albert Chiagouris by threatening to inflict unlawful physical harm with the

intent to cause them to pay money to George Bravos, Joseph Lombardi, William Messino and Sander Caravello.

Count II charged that the defendants and one Alice Erwin (subsequently acquitted) committed the offense of aggravated kidnapping on May 7, 1965, by confining Jack Chiagouris against his will for the purpose of obtaining a thing of value.

Count III charged the same five defendants (again Alice Erwin was acquitted) with the same offense as alleged in Count II, except for the charge that George Chiagouris was the person kidnapped.

Counts IV and V charged that Bravos, Lombardi and Messino committed the offense of aggravated battery on George Chiagouris (Count IV) and on Jack Chiagouris (Count V).

Judgments of acquittal were ordered as to defendants Erwin and Caravello, but guilty verdicts were returned as to the other four, finding Bravos, Lombardi and Messino guilty on all counts, and Mercurio guilty only on Count I (conspiracy). The court imposed the following sentences: Bravos, 5 to 20 years in the Illinois State Penitentiary on each of the kidnapping counts, 1 to 10 years on each of the battery counts, 6 months in the County Jail on the conspiracy count; Lombardi, 7 to 20 years on each of the kidnapping counts, 1 to 10 years for the battery on George Chiagouris and 5 to 10 years for the battery on Jack Chiagouris, 6 months in the County Jail for conspiracy; Messino, 10 to 30 years on each of the kidnapping counts, 1 to 10 years for the battery on George and 5 to 10 years for the battery on Jack Chiagouris, 6 months in the County Jail for conspiracy; Mercurio, 5 years probation, conditioned upon incarceration for 30 days in the County Jail for conspiracy.

On appeal the defendants raise the following points:

1) The defendants were denied a fair trial by the jury because the jury's verdict was coerced.

302

2) The defendants were denied a fair trial and were denied their rights of confrontation and cross-examination because the trial court refused to grant their motions for severances. These motions include all defendants except Lombardi.

3) The trial court permitted self-serving exhibits to be introduced into evidence, which constituted error.

4) The trial court admitted into evidence material regarding transactions between the brothers and Caravello which was not relevant to the issues at trial.

5) The trial court admitted into evidence material of an independent and irrelevant surveillance of defendants.

6) The court allowed the prosecutor to disclose to the jury in his opening statement that Messino had attempted to evade apprehension by police officers and that such contention could not be proved.

7) Certain remarks made by the prosecutor prejudiced defendants and deprived them of a fair trial.

On June 23, 1964, Albert, Jack and George Chiagouris, brothers and copartners in a construction firm, negotiated a loan for $50,000 from defendant Messino. Arrangements for the loan were completed in the office of Sander Caravello, at which time there were present Caravello, Messino, Bravos, and the Chiagouris brothers. Messino set the interest rate at 40 per cent and made a requirement that the $70,000 was to be repaid in 47 weekly installments of $1,500 each for 46 weeks, and $1,000 the last week. When Albert Chiagouris asked what kind of collateral would be required, Bravos said, "The only security we want is your eyeballs."

Two days later the brothers returned to Caravello's office to receive the $50,000 and to execute judgment notes for the installment notes. Lombardi was present and the brothers were informed that he would receive

the weekly payments in case Messino was not available when they were made.

Caravello had vouched for the brothers and he received a week's loan of $15,000 of the $50,000 from the Chiagourises, which arrangement was unknown to Messino. On July 28, 1964, the three brothers again met with Messino, Bravos and Caravello to borrow an additional $100,000, with the agreement that the amount, plus $30,000 interest was to be repaid within 105 days. After this transaction was completed on July 31, Messino left, and Caravello was given $25,000 of the proceeds as another loan. He signed a note for that amount and agreed to pay it back to the Chiagouris brothers plus a pro rata share of the interest the brothers would have to pay on their loan.

Defendants' counsel point out that the brothers' partnership statement dated November 1964, purporting to enumerate their assets and liabilities of that date, showed figures which did not reflect the alleged loans. They had missed making the $1,500 payment due on October 9, 1964, and on October 10, Jack and George Chiagouris met Messino in the Bee Gee Builders parking lot. Both brothers testified that Messino jumped from his car screaming obscenities at them and struck Jack in the face. George explained that they had the $1,500 and Messino told them it would cost them an additional $1,000 for each day payments were late.

In November 1964, the brothers met with defendant Sam Mercurio and explained that they were finding repayments difficult because of the $40,000 they had loaned Caravello. Mercurio promised to try to help them obtain refinancing. The brothers' attorney testified to this meeting, although neither Jack nor Albert could recall whether he was present at the time.

On November 13, 1964, the expiration date of the 105 days in which the loan of $100,000 with interest was to be paid, the three brothers met Messino in a cocktail

lounge. Lombardi and Bravos were also present, and when Albert informed them that they did not have the required payment, Messino told Bravos that the brothers had given Caravello $40,000 of the $150,000 loan. He then asked Bravos' permission "to take these fellows out and put a bullet in their head." After it was announced that a further penalty would be exacted for failure to meet payment deadlines, Caravello was brought to the table. He admitted receiving the $40,000, at which point Messino hit him in the face, kneed him, knocked off his glasses and scratched his forehead. Messino then said, "We're going to have something to eat and after we eat we're going to go for a ride, and the treatment you just got now you're going to get every five minutes along the way."

The brothers later learned that Caravello had been given a "pass." They continued to make their payments through January of 1965, but on February 20, they met Lombardi at the Oriental Gardens Restaurant and told him they did not have the money for the installment due; that a loan had been arranged with a bank. Lombardi called Messino in Florida and when Messino spoke with George he asked if he wanted him to "fly out to Chicago to get this thing straightened out."

The brothers continued the payments with difficulty, and in March 1965, when two of them went to the Bonfire Restaurant to keep an appointment with Messino they were met in the parking lot by Bravos and Messino. When they said they could not yet pay the $100,000, Bravos said, "I am going to choke you until your tongue hangs out because you guys are fooling around," and Messino shook his fist at Jack Chiagouris while demanding the money.

After the notes for the first loan and its interest had been fulfilled Messino returned them to the brothers. Although partially destroyed, fragments of the notes were admitted into evidence, as well as a piece of paper on

305

which Messino had refigured the $100,000 loan in April. From that point on it was the loan of $100,000 which served as the source of trouble.

On May 7, 1965, the brothers were to meet Bravos, Messino and Lombardi at the Wow Restaurant (Bonfire), and one of the brothers called Messino at about 7:30 p. m., to tell him that the meeting would be futile since they did not have the money for the payment. Messino said, "Either you tell me where you're at, and if I have to come out and get you, you'll get hurt. If you meet me the way you're supposed to meet me over here, everything will be all right." George and Jack went to the restaurant at about 10:30 p. m., and met Messino in a picnic area near the building. He asked where their brother Albert was and when they said he was out of town Messino grabbed them both by their ties and lifted them. He struck Jack in the face with his fist, then he struck George, kicked him, and kicked Jack on his side, then kicked George again, all the time demanding in profane language to know where Albert could be found. Lombardi knocked George's hands down and also struck Jack in the face at Messino's direction.

George was then taken to a telephone booth to call Albert and he told Lombardi that his brother was in Boston; he tried to whisper this same statement to Jack, but was prevented, and Jack told them that Albert was in some other city. At this point Messino struck Jack in the face, and Jack was taken to a telephone to call his brother, but fainted before he could do so. He was then dragged back to the restaurant where he and George were told they would not be let loose until they came up with something to secure the loan. George told them they had a trust valued at $140,000 which they would pledge as security, although there were two prior assignments on the beneficial interest. Bravos told them they wanted the assignment and that it should be made to defendant Mercurio. Mercurio arrived at the picnic area sometime

around midnight and Bravos told him the beneficial interest in the Chiagouris brothers' trust was to be assigned over to him. Both brothers said that at the time of this meeting they were visibly beaten. Mercurio left after telling them he would try to contact Albert to make arrangements for the assignment the next day.

Concerning the events at the restaurant picnic area, the defendants, Lombardi and Mercurio, admitted their presence there as well as that of defendants Bravos and Messino; they testified, however, that it was a chance meeting, and Lombardi had not come with Messino, but with an old friend, and that Mercurio had only stopped in to get something to eat. Both Mercurio and Lombardi said they had gone to the Chiagouris table and that Jack and George were not beaten.

Albert Chiagouris testified that he contacted Mercurio around midnight on that date, trying to locate his brothers, and that he was told Mercurio had just left them with Bravos and the "little guy" (Messino). Albert was told that his brothers had been "slapped around a little bit" and when he asked how bad it was, Mercurio said, "They got slapped around." Mercurio then told Albert of the proposed assignment, explaining that Bravos and Messino wanted security for the loan. Albert was told he could not reach his brothers and he said, "Now, what they are doing now, they are holding my brothers for ransom," to which Mercurio replied, "Use your own deduction." Albert called Mercurio back in about 20 minutes to see if he had heard from his brothers; Mercurio said he hadn't and probably would not until later in the day, and that Albert should call him the next morning, even though Albert insisted he would not make any assignment without talking with his brothers.

That same evening George had asked Messino to let him go home, but Messino refused, and drove the two brothers, with Bravos and Lombardi, to a cocktail lounge where Alice Erwin joined them. Two calls were made to

try to contact Albert; instead, George managed to reach a fourth brother, Richard, and told him to get in touch with Albert regarding the trust. Lombardi testified that he saw the brothers at the lounge but denied being a part of the group, while George said Lombardi gave him instructions during his conversation with Richard, telling him what to say and when to hang up. Lombardi soon left with Alice Erwin, and Bravos then left with Messino and the two brothers, driving to the Wow Restaurant parking lot, where the brothers again asked to go home. Messino refused their request, took their car keys and drove to Alice Erwin's apartment, where they stayed until about 4:00 a. m. They then drove around for half an hour and George asked to be allowed to go home, but Messino replied, "No, we'll go some place else." They went to Messino's home and were taken to the basement.

At about 10:30 a. m., on May 8, Messino told the brothers they could go on their own and that they should meet at Mercurio's office later in the morning. They drove to Mercurio's office and George said he felt "pretty lousy. Jack's got a broken jaw, he can't even open his mouth." According to George, Mercurio said, "They are a bunch of animals."

The meeting at the bank was set for 12:30. George testified that when they arrived at the bank they were all disheveled. He said, "I hadn't shaved, my clothes were wrinkled, my false tooth . . . was broken, my face was swollen, I couldn't breathe too well and I couldn't sit up straight." George said that Jack was also unshaven, "his clothes were all wrinkled, he was bent over, he couldn't open his mouth and the whole left side of his face was swollen. He was just about white as a sheet."

The brothers and Mercurio met a Mr. Andringa in the trust department of the bank and Albert joined them. Albert's testimony substantiates the physical condition of George and Jack as testified to by them. Although Mr.

Andringa did not recall that the brothers appeared beaten up, he also did not recall seeing Mercurio on that date. The beneficial interest in the trust was conveyed to Mercurio through an instrument bearing the signatures of the three brothers and Mercurio. Mercurio explained the assignment by saying it was intended to secure a $13,000 loan which he had arranged for the brothers with the River Forest Bank, by which circuitous method the brothers would divest themselves of title to the $130,000 trust so that their creditors would leave them alone, and Mercurio would hold that interest while the brothers worked out some arrangement to repay the $13,000.

New notes of debt were drawn up showing a balance due of $124,000, and a schedule of payments was agreed upon. After a series of repayments the brothers went to the Illinois Crime Commission on July 28, 1965, and agent Robert Walker was assigned to the case posing as George's brother-in-law. Subsequent payments were made with money given the brothers by the Illinois Crime Commission, and during one of the payments Walker had occasion to talk with Lombardi. At the trial, on cross-examination Lombardi denied that Walker had told him he was worried about George's getting his jaw broken as Jack had done. Lombardi further denied that Walker had asked him why he had to be so rough on Jack, and denied saying that it was only a broken jaw and could have been worse. He denied having told Walker that he had his methods of collecting money and that Jack and George had been slapped around by him.

Prior to the previous cross-examination the State disclosed at trial that Lombardi had made an oral statement to an agent, and successfully moved to expunge an earlier order directing the State to furnish defense counsel with "copies of any written or oral statements in each cause." Counsel for Bravos, Messino and Mercurio moved for a

mistrial, a severance from Lombardi, and for a severance of the conspiracy count from the substantive counts of the indictment. The motions were denied. The State then assured the court that Lombardi's confession would not be used. After objections to the foregoing cross-examination were overruled the defense counsel renewed their motions for severance of parties and counts, which motions were denied.

Walker was then permitted to testify in rebuttal regarding the conversation with Lombardi and was cautioned to mention no names Lombardi might have used. He testified that Lombardi had told him he had been involved in the beating of Jack and George, and that he had said "they had certain ways to collect and they didn't deviate from those methods." According to Walker, Lombardi had also said, "Well, it was only a broken jaw, it could have been a lot worse." At the conclusion of Walker's testimony the court admonished the jury that the evidence was to be considered "for the limited purpose of having you decide whether or not Joseph Lombardi has made out of court statements inconsistent with his testimony." The jury was further instructed that Walker's testimony "should not be considered for the purpose of establishing the truth of the facts related in the alleged conversation," and that it was "offered for impeachment purposes only."

Robert Potter, of the U. S. Treasury Department, testified that on June 11, 1965, Messino and Mercurio met at the Wow Restaurant with Caravello. After his testimony the jury was instructed to draw no inference "whatsoever that these defendants were the subject of any inquiry or investigation by this witness, his business having been some sort of law enforcement officer."

Counsel for Messino alleges that he moved the court limit the prosecutor's opening statement to exclude mention of the alleged flight by Messino at the time of his attempted arrest on August 17, 1965. This motion is not

mentioned in the report of proceedings; however, four defense counsel submitted affidavits that such a motion had been made. Two assistant state's attorneys filed counteraffidavits in which they set out that no such motion had been made. The court said it could not recall whether or not such a motion had been made.

In his opening statement an assistant state's attorney told the jury that Messino had fled agents of the Illinois Crime Commission when they attempted to apprehend him. During the trial the court sustained an objection to and struck proffered testimony that Messino ran from agent Walker during an attempted arrest.

The case was given to the jury at about 6:00 p. m. on Friday, January 20, 1967; their deliberations ceased at 2:00 a. m. on Saturday and did not resume until 10:00 a. m. One hour later the foreman advised the court that the jury was "completely deadlocked, eleven and one. We are no further than we were last night at midnight, no further along, and there's nothing we can do about it. The party just don't believe the case was proven. We sat and talked, and that's it." The court then instructed the jury to retire. At that point counsel for defendants moved for a mistrial on the ground that further deliberations would prove coercive on the juror who felt the case had not been proved. The motion was denied. Six hours later the verdicts were returned.

At the beginning of this opinion it is necessary to note that the trial of the case took place over a period of approximately nine weeks. It should be further noted that there were four defendants and thirty-six verdict forms given to the jury. The record filed in this court has 3916 pages and the abstract has 534.

In their brief the defendants make no point that they were not found guilty beyond a reasonable doubt. In the brief filed by the State the following appears:

"The defendants make no claim that they were not proved guilty beyond all reasonable doubt of

311

these crimes. The overwhelming nature of the evidence against the defendants, much of which is uncontradicted, coupled with the tales of incredible coincidences told by defendants Lombardi and Mercurio to cast an innocent light upon their conduct, leaves the defendants no choice but to concede guilt and to pray for a new trial based on purported errors in the lengthy proceedings below."

In their reply brief the defendants make the following statement:

"To imply, however, that the defendants *concede* guilt is beyond impropriety. If defendants do not question the sufficiency of the evidence, it is only out of respect for the Supreme Court's repeated admonitions to the Bar that the Court does not sit to weigh the credibility of witnesses or to determine where the truth lies in any given set of facts. See e. g., People v. Woods, 26 Ill2d 582. That there was a credibility question presented to the jury in this case cannot be denied. But, if defendants concede anything, it is only that this question begins and ends with the jury, and that this Court will not—nor should it—sit in judgment on the jury's choice of alternatives. See People v. Horodecki, 15 Ill2d 130."

█ In People v. Horodecki, 15 Ill2d 130, 154 NE2d 67, the court lays down the rule so often stated in Illinois courts that it hardly requires any citation of authority. At page 135 the court said:

"It was for the jury to weigh the testimony and determine the credibility of the several witnesses. [Citing cases.] There was ample evidence from which the jury could conclude that the defendant was one of the participants in the robbery."

In the instant case it is apparent from the record that the evidence introduced, if believed by the trier of fact,

312

was sufficient to convict the defendants beyond a reasonable doubt; consequently, the only questions to be presented to this court are those raised by the defendants with reference to the conduct of the trial.

1. The first question is whether the court properly ordered the jury to retire after their statement to the court concerning their difficulty in arriving at a verdict. Defendants' theory is that by sending the jury back to deliberate, under the circumstances, the court in effect gave an unspoken instruction to the jury to find the defendants guilty. Defendants rely upon Brasfield v. United States, 272 US 448, in which case the court held that reversible error was committed when a trial judge inquired as to the numerical division of a jury which was unable to agree, and the Supreme Court concluded that the "general tendency" of such practice was "coercive."

In the instant case we must again point out that the trial before us on review lasted almost nine weeks; that there are four defendants, each represented by different counsel; and that thirty-six verdict forms had been submitted for the jury's consideration. In oral argument in this court the defense counsel asserted that the issues at trial were relatively simple. Even if that could be assumed to be true, there was a vast amount of material presented to the jury, and a conscientious attempt to weigh the evidence would justify extensive deliberation. The jury was given the case at 6:00 p. m. on January 20, and the complained-of order of the trial court came after the jury had deliberated approximately eight hours.

The jury was called into court three times on the evening of January 20, retired for sleep at 2:00 a. m., resumed deliberations at 10:00 a. m. on January 21, and the foreman made his comments to the court at 11:00 a. m. that same date. The jury continued its deliberations for five and one half hours, allowing a reasonable time for lunch, before reaching a verdict. That a decision was not immediately forthcoming after deliberations were re-

313

sumed tends to detract substantially from the argument that the decision was coerced by the trial judge. Defendants are not entitled to relief simply because a juror is ultimately persuaded to join in the decision. Furthermore, the jury did not return verdicts against all the defendants on all the counts. Defendant Mercurio was found guilty only on Count I. Again, this does not indicate that the jury had been coerced by the trial judge into blanket findings. Rather, it suggests a jury which carefully considered the evidence and reached its decisions on the basis of its own determination.

 Whether or not a jury should be discharged is a matter which rests in the sound discretion of the trial court, and its judgment in this regard will not be disturbed unless this discretion is shown to have been clearly abused. People v. Daily, 41 Ill2d 116, 242 NE2d 170; People v. Mays, 23 Ill2d 520, 179 NE2d 654. In Daily, after six and one half hours of deliberation the foreman advised the court that the jurors had not reached an agreement and the judge recommitted them to further deliberations. Shortly thereafter the jury returned a guilty verdict. In holding that the jury verdict was not coerced by the trial court the Supreme Court noted that the presentation of the case had taken four days, with thirty-one witnesses presenting conflicting evidence, and that it "cannot be realistically argued that the trial court coerced the jury into returning a verdict."

The present case lasted nearly nine weeks and included the testimony of 23 witnesses, with more than 20 exhibits. On the basis of this record we cannot say that the trial court abused its discretion by allowing the jury to continue deliberations after they had met for approximately eight hours. Brasfield v. United States, supra, does not indicate that a different result would be proper. There the trial court asked the jury to tell its numerical split, and when informed of the division the court instructed the jury to continue deliberations. The

Supreme Court held that "the inquiry itself" necessitated a reversal of the conviction.

The practice of trial judges questioning juries with reference to their numerical division has been earlier condemned in Burton v. United States, 196 US 283. However, these cases condemn the active intrusion of the trial court into the jury's deliberation process. The case before us involves no such intrusion since the information given to the court was unsolicited and the court was exercising its sound discretion.

■ 2. The defendants argue that they were denied the right of confrontation and cross-examination by reason of the trial court's refusal to allow their motions for severances of persons and counts. They state that Lombardi's testimony tended to incriminate the other defendants. On August 7, 1965, Lombardi made certain self-incriminating statements to agent Walker which statements also incriminated the other defendants by inference. Lombardi told Walker that he had been involved in the beatings and that "others" had the responsibility for determining the manner in which the loans were to be paid off; that "they" had ways of collecting. Defendants argue that Lombardi's statements amounted to an accusation of his codefendants of the crimes for which they were being tried.

The defendants further argue that, assuming there had been a severance, Lombardi's statements, unless construed as an act in furtherance of conspiracy, would have been inadmissible as evidence of the substantive counts; therefore, the defendants contend that the introduction of the evidence prejudiced them.

On trial, under direct examination, Lombardi denied that he or the other defendants had beaten the Chiagouris brothers—testimony inconsistent with his purported statements to agent Walker. On cross-examination he denied making certain damaging admissions. Walker was then called to impeach Lombardi's testimony, after

315

which the jury was instructed that the testimony regarding statements Lombardi had made to Walker was admitted for the limited purpose of impeachment, and that Walker's testimony should not be considered for the purpose of establishing the truth of the facts related in the alleged conversation. Defendants argue that an instruction could not repair the damage caused by allowing the evidence to be introduced, and that the defendants were deprived of a fair trial and "of the constitutional right to confront and cross examine that accusation."

Here we must point out that one does not confront or cross-examine an accusation; one confronts or cross-examines a witness. In Bruton v. United States, 391 US 123, it was held that the defendant was denied his right of confrontation and cross-examination when a codefendant's out-of-court statement which inculpated the defendant was read into evidence, but the codefendant himself did not testify. However, in the case before us Lombardi did testify and in fact attempted to exculpate both himself and his codefendants by stating that neither he nor anyone else beat the Chiagouris brothers on the night in question.

The relation of out-of-court statements made by Lombardi to Walker, which were inconsistent with his testimony at trial, was used to impeach Lombardi, and from the State's viewpoint, to prevent the giving of unchallenged and perjured testimony to the jury. Furthermore, Walker, in using Lombardi's alleged statement, deleted any names Lombardi had mentioned. Where names of codefendants are omitted from the body of a confession the codefendants are still prejudiced if it is apparent from the context that it was the names of the codefendants which were deleted. People v. Hodson, 406 Ill 328, 94 NE2d 166; People v. Gregory, 22 Ill2d 601, 177 NE2d 120. Defendants argue that it was an inescapable conclusion that the names de-

leted by Walker from Lombardi's statement were those of the codefendants.

■ This argument, however, must fall, since the complained-of testimony was not introduced as a part of the State's case-in-chief, but was brought in only as rebuttal testimony. Lombardi testified; consequently, he was subject to cross-examination. The jury had been carefully instructed regarding the purpose for which they were and were not to consider Walker's testimony. We do not feel that the use by Lombardi of the word "they" necessarily pointed to the codefendants. In any case, prior evidence had so firmly linked the defendants together that no further proof was necessary to establish the conspiratorial bond between them.

■ 3. The defendants argue that the State was permitted to introduce into evidence self-serving exhibits, which admission was reversible error. The exhibits referred to were various writings and one check, intended to establish the fact that loans actually were made. People's Exhibits 1 and 3 were carbon copies of notes allegedly executed by the brothers and delivered to defendant Messino for the first and second loans. People's Exhibit 14 was fragments of original notes executed for the first loan, allegedly returned by Messino to the brothers; and People's Exhibit 5 was a $10,000 cashier's check purportedly refused by Lombardi, which check was later cashed and the proceeds turned over to Lombardi.

No objection was made to the testimony of the brothers regarding the making or repayment of the loans. Such evidence was relevant in establishing a foundation for believing that violence resulted when the payments became tardy. The only objection made on appeal is that self-serving documents were introduced, together with the testimony in support of the fact that the loans were actually made, and that the documents should not have been admitted.

317

This is not a serious issue. The damaging evidence was the testimony of the brothers regarding the making of the loans and the repayment procedures. The exhibits were merely secondary sources, and the fact that the defendants assert there was no connection between the documents and the alleged transaction does not require the exclusion of the documents. They represented physical evidence connected to the defendants through the testimony of State witnesses, and as such were admissible. The jury had the burden of assessing the proper weight to be given the documents.

4. The defendants contend that error was committed when the trial court permitted the introduction of evidence of transactions between the brothers and defendant Caravello, who was acquitted by a directed verdict at the close of all the evidence. It is asserted that evidence of the said transactions was irrelevant to the issues on trial, and that evidence concerning the beating of Caravello was prejudicial to the defendants. However, the trial court instructed the jury not to consider the evidence of these transactions as against anyone but Caravello. In giving such instruction the court exercised extreme caution, and the admitting of the evidence was unquestionably proper.

The fact that the brothers were able to give Caravello large sums of money immediately after the meetings with the other defendants implies that they had just obtained large sums of money through the loans from the defendants. Evidence concerning the beating of Caravello when the defendants learned that the brothers were slow in payments to them on account of loans they had made to Caravello, substantiates the intimidation charge on the part of the brothers, since the beating occurred in their presence and could have been intended as a lesson to them that they should make their payments on time. As we have said, the trial court instructed the jury to consider the evidence only against Caravello. Under the

circumstances, the limiting instructions adequately protected the defendants.

■■ 5. The defendants assert that evidence was permitted to be introduced showing an independent surveillance of some of the defendants which took place on a date which was irrelevant to the instant case and that the permitting of such evidence was error. Robert Potter, criminal investigator for the Secretary of the Treasury, testified he had seen Messino, Mercurio and Caravello meet at the Wow Restaurant on July 11, 1965. The date is not important with reference to the charges against the defendants. The defendants argue that the testimony was prejudicially suggestive that they were guilty of other misconduct, and that such testimony must have affected the jury in spite of the fact that the trial court instructed them to draw no inferences that the defendants were the subject of an inquiry by some other law enforcement agency. The alleged beating of the brothers had occurred in the Wow Restaurant during the previous month, and Potter's testimony was circumstantial evidence tending to show an association between some of the defendants who were meeting at the same place. Although the evidence may not have been absolutely necessary to prove the case, that fact does not make its admission so prejudicial as to require reversal. Great latitude should be granted to the trial court in assessing the admissibility of circumstantial evidence when such evidence was offered to establish factors pointing towards a conspiracy. In this instance the court did not abuse its discretion by allowing Potter to testify.

■■ Defendants argue that the trial court should have restricted the prosecutor's opening statement by not allowing him to interject remarks regarding Messino's flight from the arresting authorities. There is a direct dispute as to whether or not defense counsel had ever made a pretrial motion to restrict the State's

319

opening statement, and since the motion and the ruling do not appear in the record, the argument could be disregarded. People v. Funches, 17 Ill2d 529, 162 NE2d 393. The rule laid down in Muscarello v. Peterson, 20 Ill 2d 548, 170 NE2d 564, does not apply. In that case the court held that if the alleged conduct is so prejudicial that the other party cannot receive a fair trial the court will review and consider assignments of error, even though no objection was made. That rule has no application to the situation in the instant case. However, assuming that defense counsel made such a motion in the instant case, there was still no reversible error. The jury was instructed to disregard the remarks it had heard concerning the chase. The evidence introduced was minimal and the instruction to disregard it came immediately after the testimony. Further, on the basis of the record, this one point is dwarfed by the other testimony regarding Messino's guilt. At most, it was a minor error which was quickly and adequately rectified.

██ ██ Finally, defendants argue that they were denied a fair trial by improper comments of the prosecutor suggesting that the defense counsel were acting "tricky," and employing unethical tactics in defense of their clients. We must consider that the trial was long and hard fought; and since no trial is a perfect one, in such cases counsel for both parties often say things which would be better left unsaid. Comments can be so far out of line as to deny defendants a fair trial; however, this did not occur in the instant case. True, caustic comments were made by both the State and defense counsel, but no comment was made upon inadmissible evidence or any other matter which would prejudice the defendants. See People v. Gilmer, 110 Ill App2d 73, 249 NE2d 129. Convictions are not reversed simply because either or both sides made a few comments which would have been better not made. In view of the clear and convincing evidence of guilt we cannot say that such re-

marks prejudicially influenced the jury or that the verdict would have been otherwise had the remarks not been made, and we will apply the rule laid down in People v. Hines, 30 Ill2d 152, 157, 195 NE2d 712, to that effect. In People v. Naujokas, 25 Ill2d 32, 182 NE2d 700, the court, referring to certain remarks made in the case, said at page 38:

> "While the remarks were improper, nevertheless, in view of the clear and convincing evidence of guilt of the crime charged, we are unable to say that the remarks may have influenced the result, or that the verdict could have been otherwise had the remarks not been made. People v. Stephens, 6 Ill2d 257."

In a very recent case handed down by the United States Supreme Court, Harrington v. California, 37 USLW 4472, the court said:

> "We do not suggest that, if evidence bearing on all the ingredients of the crime is tendered, the use of cumulative evidence, though tainted, is harmless error. Our decision is based on the evidence in this record. The case against Harrington was not woven from circumstantial evidence. It is so overwhelming that unless we say that no violation of Bruton can constitute harmless error, we must leave this state conviction undisturbed."

In the instant case the evidence of the defendants' guilt, as in Harrington, was so overwhelming that any statements made by counsel are not of such character as to constitute reversible error. Defendants' arguments must fail, and the judgment of the Circuit Court is affirmed.

Affirmed.

LYONS, P. J. and BURKE, J., concur.