THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JOHN H. KIRK, Defendant-Appellant.

First District (4th Division)    No. 78-175

Opinion filed August 30, 1979.—Rehearing denied September 27, 1979.

460

James J. Doherty, Public Defender, of Chicago (Timothy O'Neill, Assistant Public Defender, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, James S. Veldman, and Paul D. Kerpan, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE ROMITI delivered the opinion of the court:

The defendant was convicted of the murder of Allan W. Alberts and sentenced to from 35 to 70 years in the Illinois Department of Corrections. He appeals, contending that the trial court (1) committed reversible error when during jury deliberation it asked the jury the numerical count of the last ballot; (2) erred in not declaring a mistrial when the jury failed to reach a verdict two hours after receiving a *Prim* instruction; (3) erred in not suppressing all identifications made by Sana Alberts as being fruits of an unduly suggestive lineup; (4) erred in not quashing the defendant's arrest and suppressing resulting evidence as being the direct result of an invalid *Terry* stop. The defendant also argues that the state's attorney's final argument erroneously instructing the jurors concerning their duties prejudiced the defendant.

We affirm the trial court.

In October 1975, a Cook County grand jury charged the defendant, John H. Kirk, with the September 21, 1975, murder of Allan W. Alberts. Prior to trial a hearing was held on a motion to suppress the identification of the defendant.

The first witness at the pretrial hearing was Sana Alberts. She testified that after witnessing the shooting she told the police that the assailant was tall, thin, had wavy, curly hair, was "kind of rugged-looking" and that he wore dark clothes and a black leather jacket. She also told them that she had never seen him before. After the shooting, Sana was taken to the hospital and then to a police station to view a lineup, the police telling her that they had a suspect. She looked through a glass window and saw six men in the lineup. She recognized three or four of them from having seen them in the Silver Spur Lounge. She did not know any of them personally. She told the police of her recognition. It is not clear, however, whether she told the police immediately or only after identifying defendant. Sana stated that she observed the lineup for approximately five minutes. Police Officer George Buenik asked her if she wanted the men in the lineup to wear a jacket. At the time Buenik asked her that, she already had made a positive identification. The men then took turns changing into a single dark jacket. Sana testified that during the time of the clothing switch she again made an identification and told Buenik of her identification. She only identified one person in the lineup. She did not make the identification based on the clothing worn by the defendant during the lineup, but identified him because she saw his face during the shooting. At this hearing she stated that the coat used in the lineup was similar to the one the assailant wore. However, she agreed that she could have told the police that the coat did not look like the one worn by the assailant. Defendant was not one of those she had seen at the Silver Spur Lounge.

Prior to the shooting Sana had one drink at the Silver Spur Lounge,

where she had been for 2½ hours prior to the shooting. Earlier in the evening, from 9 p.m. to 5 a.m., she was with Allan in the Mist Lounge. She had two drinks at the Mist Lounge, but did not see any of the men in the lineup at that tavern. Sana had been awake for 12 to 14 hours when the shooting occurred at 8:20 a.m.

On cross-examination, Sana testified that she did not see the men at the police station until she saw them in the lineup. Although she observed the lineup during a 5-minute period, she was not looking at the lineup the entire time. She had to stand on a chair to look through the lineup glass window, but she got off the chair at least once. She was also waiting to hear how Allan was; she did not at that time know if he was dead. When Buenik asked Sana if she wished to view the men with jackets on, she stepped off the chair, then got back on when the men put on the jacket.

Officer Buenik, who investigated the murder, also testified at the hearing. He procured the other five men for the lineup from the Silver Spur Lounge. He stated that Sana told him she recognized four of the men in the lineup as customers of the Silver Spur that morning.

Buenik testified that the first time Sana Alberts looked at the lineup, for approximately 1 or 2 minutes, she did not make an identification. The second time she viewed the men they were wearing different colored jackets. The men were given different jackets, some light-colored and others dark. The defendant wore a dark brown leather jacket. During this second observation, Sana viewed the men for two minutes and then made an identification. Buenik testified that the other men were wearing their own jackets and that 5 to 10 minutes elapsed between Sana's two viewings. It took a total of 15 minutes for Sana to identify the defendant. Buenik stated that Sana was sober during her identification.

Following this evidence, the defendant's motion to suppress the identification was denied.

At trial, the first witness in the People's case in chief was Sana Alberts. She testified that the deceased was her husband through a common-law marriage. From 9 p.m. on September 20, 1975, to 5 a.m. on September 21, 1975, her husband worked at the Mist Lounge. She was at work with him the entire evening, and had one or two drinks. After he finished work, they were at the Silver Spur Lounge from 5:30 a.m. to 8:15 a.m. Although Sana had one more drink, she stated that she very seldom drank alcohol.

At approximately 8:20 a.m., she and her husband left the bar with Johnnie Doran. While they were walking down the street, a man came up from behind them and shot Allan three times in the back of the neck. While Allan was lying on the ground, the man shot him two more times. When Allan fell at her feet after the first three shots, Sana backed away; she was about seven to 10 feet from the gunman. She looked at the gunman's face as he fired the last two shots. Sana identified this man as the

defendant. The defendant then ran back in the direction of the Silver Spur. She had never seen the defendant before.

Later that day Sana gave a description to the Cicero Police Department and viewed a lineup of six men. She recognized three or four of the men as customers of the Silver Spur. She identified the defendant in the lineup as the one who shot her husband.

On cross-examination, Sana testified that after Allan fell to the ground upon being shot, she looked at the defendant and saw him shoot her husband in the chest. A total of five shots were fired by the defendant. She said the defendant used a black gun; however, she might have told Buenik at the preliminary hearing on October 3, 1975, that it was a silver gun. Sana then said she did not actually see the gun since she was looking at the defendant. Her description of the assailant, given to the police, was that he was tall and thin, with curly, wavy, collar-length hair, 35-42 years of age, and wore a dark jacket, dark pants, and a light shirt and dark shoes. She did not tell the police that he had a mustache. She also stated that she had been to the Silver Spur a few times, and that she woke up at 5 or 6 p.m. on September 20, 1975. Although at trial Sana testified that the men in the lineup put on a coat similar to the assailant's, she thought that she might have told the police during the lineup that the coat worn by the defendant did not look like the assailant's coat.

Cicero police officer Buenik testified that he was eating in Johnnie's Grill located at 21st and Cicero at 8:15 a.m., September 21, 1975, when he heard gunshots. He ran outside and looking north saw a woman crouched over a man lying on the street. He simultaneously saw three men running north on Cicero, with one of them running between the parked cars. He got his squad car and drove toward the area. He then saw a car, a yellow Pontiac Firebird with a black top that was parked in front of the Silver Spur, drive away. The reason he went after this car was that no one else was in the vicinity. After the car did not stop when Buenik turned on his red lights and siren, he chased the car at speeds of 60-70 MPH. The Pontiac finally stopped and the driver, who was the only one in the car, left the area. As he was attempting a pursuit on foot, Buenik met Officers Dorko and Zanko and they split up to find the driver. Unsuccessful, Buenik went back to the Pontiac and searched it. Two officers then brought a man, who was handcuffed, to Buenik. Buenik identified this man as the defendant. At the police station, Officer Dorko gave Buenik the defendant's gun, a .38-caliber, blue-steel, six-shot revolver, and five expended cartridges and one live cartridge. Buenik stated that when he first observed the driver get out of the Pontiac he was wearing dark clothing. When the defendant was brought back to Buenik, he was wearing dark clothing and a leather jacket.

On cross-examination, Buenik testified that Sana did not give the

assailant's age or weight in her description to police and did not mention a mustache. She said the assailant wore a black leather jacket. When she first looked at the lineup, she did not identify anyone. However, when the defendant wore a brown leather jacket she was able to identify him. The men in the lineup wore different jackets; some of the jackets were lighter than that worn by the defendant; one other man in the lineup beside the defendant wore a dark leather jacket. Sana told Buenik that the jacket worn by defendant looked different than that worn by the assailant at the time of the shooting.

Chicago police officer Joseph Mitchello was on duty on September 21, 1975, at 8:30 a.m., and heard a police siren and saw a Cicero police car chasing another car. When he caught up with them, both cars were abandoned. After speaking with a Cicero police officer (he was not allowed to testify to the conversation) he then drove down an alley near the scene. He saw a man walking towards him, who then turned left down another alley. Mitchello stopped his car and with his weapon drawn ordered the man to halt. The man stopped, looked over his shoulder, threw his hands in the air, said "Oh, no," and then threw something out of his hands. Mitchello identified this man as the defendant. The defendant was approximately 25-30 feet away. He ordered the defendant to the police car, handcuffed him, then retrieved the thrown object which turned out to be a gun. The gun was a .38-caliber, blue-steel weapon with a brown handle. Mitchello then took the defendant to the Cicero police car and turned him over to the Cicero police and gave them the gun.

On cross-examination, he admitted that he picked up the gun without a handkerchief.

Defense counsel then filed a motion to quash the arrest and suppress the evidence obtained, but this motion was denied.

James Stewart, a truck driver, was across the street from the Silver Spur on September 21, 1975, at 8:20 a.m. Three people were leaving the tavern and were directly in his line of view when another man came out of the tavern and ran up to the deceased and shot him five times. Stewart saw no one else in the vicinity besides the shooter who then ran back past the tavern. The assailant was male, white, 25-30 years of age, 5 feet 10 or 11 inches tall, 165 to 175 pounds, dark hair, had a 5 o'clock shadow or little mustache, and wore a dark coat and pants. The witness only saw him for about 30 seconds and was about 75 feet away during this incident. Stewart then identified the defendant as the shooter.

Stewart remained in the area for some time trying to get the attention of a police officer. He then drove home, stopping off to give a report to the desk sergeant at the Oak Lawn Police Station. On cross-examination Stewart stated that his first identification of the defendant as the offender occurred during trial.

Yuksel Konacki, who performed the autopsy, testified he recovered three bullets from the body and it was his opinion that Allan died from a bullet wound to the head. Emory Herbert Cox, an evidence technician, testified that he recovered eight prints from the yellow Pontiac and gave them to the crime laboratory for evaluation. On cross-examination, Cox admitted that he did not check the gun for fingerprints because it was already contaminated. He stated the search for prints would be fruitless since an officer had been handling the weapon. Burton J. Buhrke of the Illinois Bureau of Identification testified he received the prints from Cox and stated that the prints found in the Pontiac matched those of the defendant. Jack Norman Welty, Jr., of the Illinois Department of Law Enforcement testified that he examined two bullets from Allan's body and the gun recovered by Officer Mitchello. He testified that the bullets could only have been fired from that particular weapon.

The People then rested and the defendant's motion for a directed verdict was denied. The only evidence offered by the defendant was a stipulation that police officer Michael Dix of Oak Lawn was told by James Stewart that the offender used a 9-millimeter automatic pistol to kill the victim. The defendant then rested.

Following closing arguments, the jury began deliberations at 1:10 p.m. on August 10. At 7:06 p.m., although the jury had not indicated that they could not reach a verdict, the judge called the jury in and asked them if they could reach a verdict. The foreman asked for at least another hour. The court assured them that it was not in a hurry. It then, over objection, gave them a *Prim* instruction. *People v. Prim* (1972), 53 Ill. 2d 62, 289 N.E.2d 601, *cert. denied* (1973), 412 U.S. 918, 37 L. Ed. 2d 144, 93 S. Ct. 2731.

At 8:55 p.m. the trial judge received a note signed by the jury foreman saying that "after eight votes we cannot come to a verdict." The defense motion for a mistrial was denied. The judge then called the jury out and the following colloquy occurred:

"The Court: Mr. Foreman, the Court has received your note. I am going to inquire of you, I don't want to know how the jury is voting, in which direction, but I would like to know the numerical count of your last ballot was, do you recall?

The Foreman: The last ballot?

The Court: The last ballot, yes. But remember, I don't want—

The Foreman: Ten to two.

The Court: All right.

What we are going to do is, and this determination is not based upon the numerical count of your vote, that was just a matter of inquiry by the Court. What we are going to do is arrange for overnight accommodations for the jury so that you, as you know,

you can't be separated during the period of your deliberations, and so we are going to arrange an overnight accomodations at a motel which we have already begun to arrange for."

The court then denied another defense request for a mistrial.

At 2:55 p.m. on the following day, the jury informed the judge that they had reached a verdict. Following the denial of another defense motion for mistrial, the jury found the defendant guilty of murder.

On September 16, 1977, the court denied defendant's motion for a new trial and for judgment notwithstanding the verdict. Defendant was sentenced to 35 to 70 years in the Illinois Department of Corrections.

## I.

■■ The defendant's first contention is that the trial court committed reversible error when it asked the jury how they were divided. In *People v. Golub* (1929), 333 Ill. 554, 165 N.E. 196, and *People v. Duszkewycz* (1963), 27 Ill. 2d 257, 189 N.E.2d 299, the Illinois Supreme Court held that while such inquiries were erroneous, the error was not reversible since "it can not be said that they interfered with the deliberations of the jurors to the prejudice of plaintiff in error, or that they hastened the verdict." *People v. Golub* (1929), 333 Ill. 554, 165 N.E. 196, 199; *People v. Duszkewycz* (1963), 27 Ill. 2d 257, 263, 189 N.E.2d 299, 302.

The defendant has made no claim that the inquiry was prejudicial to him. What the defendant does claim is that following *Crist v. Bretz* (1978), 437 U.S. 28, 57 L. Ed. 2d 24, 98 S. Ct. 2156, we are bound by *Brasfield v. United States* (1926), 272 U.S. 448, 450, 71 L. Ed. 345, 346, 47 S. Ct. 135, 136, which ruled:

> "We deem it essential to the fair and impartial conduct of the trial, that the inquiry itself should be regarded as ground for reversal. Such procedure serves no useful purpose that cannot be attained by questions not requiring the jury to reveal the nature or extent of its division. Its effect upon a divided jury will often depend upon circumstances which cannot properly be known to the trial judge or to the appellate courts and may vary widely in different situations, but in general its tendency is coercive. It can rarely be resorted to without bringing to bear in some degree, serious although not measurable, an improper influence upon the jury, from whose deliberations every consideration other than that of the evidence and the law as expounded in a proper charge, should be excluded. Such a practice, which is never useful and is generally harmful, is not to be sanctioned."

At the time filed *Brasfield* applied only to Federal courts. But *Crist v. Bretz* stands for the principle that where a Federal rule is an integral part of the constitutional guarantee, then that rule must equally apply in State

courts. (See also *Benton v. Maryland* (1969), 395 U.S. 784, 23 L. Ed. 2d 707, 89 S. Ct. 2056.) The decision in *Brasfield,* however, was not based on constitutional interpretation but on the court's supervisory powers and thus is not controlling in a State proceeding. *(Marsh v. Cupp* (D.C. Or. 1975), 392 F. Supp. 1060, *aff'd* (9th Cir. 1976), 536 F.2d 1287, *cert. denied* (1976), 429 U.S. 981, 50 L. Ed. 2d 590, 97 S. Ct. 494.) Accordingly, we believe that merely because the United States Supreme Court in 1926 deemed it more effective in discouraging such questions to make any inquiry *per se* error, despite the total absence of prejudice, we are not, despite *Crist,* required to do so. Furthermore, we note that in fact not only have many State courts refused to reverse despite such questioning (see Annot., 77 A.L.R. 3d 769 *et seq.* (1977)), so have some Federal courts even when reviewing Federal trials *(e.g., Anderson v. United States* (8th Cir. 1959), 262 F.2d 764, *cert. denied* (1959), 360 U.S. 929, 3 L. Ed. 2d 1543, 79 S. Ct. 1446); furthermore it was indicated in *Marsh v. Cupp* (9th Cir. 1976), 536 F.2d 1287, *cert. denied* (1976), 429 U.S. 981, 50 L. Ed. 2d 590, 97 S. Ct. 494, that *Brasfield* is not controlling if the jury's answer does not mention whom the jury favored and it was indicated in *United States v. Rogers* (4th Cir. 1961), 289 F.2d 433, that in fact the reversal in *Brasfield* was actually because of the combination of the inquiry as to numerical division and the giving of an *Allen* charge. *(Allen v. United States* (1896), 164 U.S. 492, 41 L. Ed. 528, 17 S. Ct. 154.) Thus, since the defendant has not even suggested how he could have been prejudiced by the inquiry, we adhere to the rule set forth in *People v. Golub* (1929), 333 Ill. 554, 165 N.E. 196, and *People v. Duszkewycz* (1963), 27 Ill. 2d 257, 189 N.E.2d 299, and find no reversible error.

## II.

The defendant next contends that the trial judge erred in not declaring a mistrial when the jury failed to reach a verdict two hours after the *Prim* instruction was given.

■■ Whether or not a jury should be discharged is a matter which rests in the sound discretion of the trial court, and its judgment in this regard will not be disturbed unless this discretion is shown to have been clearly abused, even though the jury has indicated they are hopelessly deadlocked. *(People v. Daily* (1968), 41 Ill. 2d 116, 242 N.E.2d 170, *cert. denied* (1969), 395 U.S. 966, 23 L. Ed. 2d 752, 89 S. Ct. 2112; *People v. Allen* (1977), 47 Ill. App. 3d 900, 365 N.E.2d 460, *appeal denied* (1977), 66 Ill. 2d 631; *People v. Bravos* (1969), 114 Ill. App. 2d 298, 252 N.E.2d 776, *appeal denied* (1969), 42 Ill. 2d 583, *cert. denied* (1970), 397 U.S. 919, 25 L. Ed. 2d 100, 90 S. Ct. 927.) In *Daily,* after 6½ hours of deliberation, the foreman informed the judge they had not reached a verdict and that the voting had not changed in the preceding two or three hours. The judge

recommitted them for further deliberation and shortly thereafter the jury reached a verdict. In holding that the jury verdict had not been coerced by the trial court, the Supreme Court noted that the presentation of the case had taken four days with 31 witnesses presenting conflicting evidence and that it could not realistically be argued that the trial court coerced the jury into returning a verdict. In *Allen,* after the jury deliberated for over six hours, it indicated it was hopelessly deadlocked. It was sequestered overnight. The next day, after deliberating for several hours, it again announced it was hopelessly deadlocked. The judge gave the jury a *Prim* instruction and the jury reached its verdict 1½ hours later. No error was found. In *Bravos,* the jury deliberated for eight hours and then retired for the night. One hour after deliberations recommenced the next morning the foreman announced that the jury was " 'completely deadlocked, eleven and one. We are no further than we were last night at midnight, no further along, and there's nothing we can do about it. The party just don't [*sic*] believe the case was proven. We sat and talked, and that's it.' " (114 Ill. App. 2d 298, 311, 252 N.E.2d 776, 782.) The judge ordered the jury to continue deliberating and denied a defense motion for a mistrial. Six hours later, the verdict was returned. The court found no coercion, pointing out *inter alia* that the fact that a decision was not immediately forthcoming after deliberations were resumed tended to detract substantially from the argument that the decision was coerced by the trial judge.

In the present case while the jury was unable to reach a verdict that first evening, it at no time indicated that it was hopelessly deadlocked and would be unable to reach a verdict. The trial had lasted five days; the jury had only deliberated for eight hours when the judge ordered them sequestered for the night and denied the defense motion for a mistrial. Moreover, as in *Bravos,* the fact the jury deliberated for several more hours before reaching a verdict detracts from the argument the decision was coerced by the trial judge. We find no error in the court's refusal to discharge the jury and declare a mistrial.

While the defendant objected below to the giving of the *Prim* instruction, this objection was not pursued on appeal. We would note, however, that the defendant is in error in assuming the instruction cannot be given unless the jury is deadlocked. *People v. Wilson* (1976), 37 Ill. App. 3d 560, 346 N.E.2d 161, *appeal denied* (1976), 63 Ill. 2d 562.

### III.

The defendant's third contention is that the identifications made by Sana Alberts at the lineup and in court were the fruits of a suggestive lineup and should have been suppressed because Sana recognized four of

the persons in the lineup and because the defendant was only identified after he put on the leather jacket.

■■ The burden is on the defendant to show that the confrontation conducted was unduly suggestive and conducive to an irreparably mistaken identification. (*People v. Reedus* (1977), 46 Ill. App. 3d 427, 361 N.E.2d 33; *People v. Brown* (1972), 52 Ill. 2d 94, 285 N.E.2d 1.) In determining whether a pretrial confrontation is unnecessarily suggestive, the courts must look to the totality of the circumstances surrounding it. *People v. Hamilton* (1977), 54 Ill. App. 3d 215, 369 N.E.2d 377.

■■ The lineup was not improper merely because Sana recognized three or four of the men as having been at the Silver Spur. The police obtained all of the persons for the lineup except the defendant from the Silver Spur. This, in itself, was not improper. It is true that Sana had been in the Silver Spur prior to the shooting and that she told the police that she had not seen the assailant before the shooting. The fact she had not seen him does not mean the assailant did not come from the Silver Spur—indeed it is clear from James Stewart's testimony that he did. The police obtained the individuals some time after the shooting (the lineup was at 11:30 a.m.), and the customers of the tavern would necessarily have changed in that time. The police did not knowingly and intentionally select persons known to Sana to appear with the defendant in the lineup and they did not know until sometime after Sana commenced viewing the six men that she recognized three or four as customers of the lounge. Had the police dismissed those men at that point and selected four others they would have singled the defendant out as a suspect. Furthermore, the fact that Sana recognized three or four of the six means there were two or three, including the defendant, that she did not recognize as customers of the lounge. A lineup is not defective or prejudicial merely because of its numerical composition, but that fact merely goes to the weight of the identification testimony. *People v. Irons* (1974), 20 Ill. App. 3d 125, 312 N.E.2d 664, *appeal denied* (1974), 56 Ill. 2d 589; *People v. Kinzie* (1975), 31 Ill. App. 3d 832, 334 N.E.2d 872, where only one other man appeared in the lineup with the defendant.

The evidence is in conflict as to whether the defendant and the other men in the lineup tried on the same jacket or different ones and as to whether Sana identified the defendant before he tried on the jacket. The trial court could have believed Sana's testimony on both points, and where the evidence is in conflict a reviewing court will not substitute its judgment for that of the trier of fact. (*People v. Akis* (1976), 63 Ill. 2d 296, 347 N.E.2d 733.) However, even if we assume that the individuals in the lineup tried on different jackets and that Sana did not make her identification until after they put the jackets on, we do not believe that

under the particular circumstances the confrontation was unduly suggestive. Even accepting Officer Buenick's testimony, defendant was not the only individual in the lineup wearing a dark leather jacket.

Furthermore, both Sana and Officer Buenik admitted that she had stated at the time that the jacket worn by the defendant in the lineup did not look like the one worn by the defendant. Indeed, while she described the jacket worn by the assailant as black, the defendant's jacket at the lineup was brown. It follows that, as Sana herself testified, she recognized the man, not the jacket. Compare *People v. Hamilton* (1977), 54 Ill. App. 3d 215, 369 N.E.2d 377.

■ Accordingly, considering these matters individually and collectively, we do not believe them to be so impermissibly suggestive as to give rise to a substantial likelihood of irreparable misidentification. In any event, whether there was a denial of due process depends on whether the witness' later identification at trial was dependent on or influenced by a suggestive lineup or whether the in-court identification had a prior, independent origin. (*People v. Spence* (1976), 43 Ill. App. 3d 1044, 357 N.E.2d 1245; *People v. Irons* (1974), 20 Ill. App. 3d 125, 312 N.E.2d 664, *appeal denied* (1974), 56 Ill. 2d 589.) The defendant contends that there was no independent origin, arguing that she lacked a good opportunity to view the assailant, that she had been awake all night and had spent the last 14 hours in taverns where she had had three drinks; that she had only given a general description to the police, having as its most salient feature the dark jacket and did not mention his mustache and that she was unable to identify the defendant until after he put the jacket on, making it likely she identified the jacket, not the man. As we already have noted, this last contention is refuted by all the testimony which shows Sana did not recognize the jacket at all, as well as by her testimony, which the judge and jury were entitled to believe, that she recognized the defendant before the defendant put the jacket on.

Sana watched the defendant shoot Allan twice. It was 8:20 in the morning. While the shooting only lasted a few seconds, this was sufficient time to observe the assailant. (*People v. Smith* (1974), 18 Ill. App. 3d 859, 310 N.E.2d 734, *appeal denied* (1974), 56 Ill. 2d 590.) While Sana had been awake all night, she had slept until 5 p.m. the previous afternoon and had been awake only 12 to 14 hours at the time of the shooting. While she had had three drinks during the course of the eleven or so hours she and Allan were at the taverns, Officer Buenik testified that she was sober. The black jacket was only one of many items mentioned in the general description which included such facts as that the assailant was tall and thin with curly, wavy hair. The failure to mention facial characteristics such as a mustache, assuming that the defendant had one that day, does not affect the victim's ability to make a positive identification but merely affects the

credibility of her identification. *People v. Smith* (1974), 18 Ill. App. 3d 859, 310 N.E.2d 734, *appeal denied* (1974), 56 Ill. 2d 590; *People v. Agosto* (1979), 70 Ill. App. 3d 851, 388 N.E.2d 1018; *People v. Mendoza* (1978), 62 Ill. App. 3d 609, 378 N.E.2d 1318.

■■ In short, Sana had an opportunity to view the assailant face-to-face for an adequate length of time, and there was apparently no variance between the features she described and his actual appearance. She identified him in a lineup held only three hours after the crime. Such facts reveal a sufficiently independent and uninfluenced source to stand as the basis for the witness' in-court identification. *People v. Smith* (1974), 18 Ill. App. 3d 859, 310 N.E.2d 734, *appeal denied* (1974), 56 Ill. 2d 590; *People v. Irons* (1974), 20 Ill. App. 3d 125, 312 N.E.2d 664, *appeal denied* (1974), 56 Ill. 2d 589.

## IV.

The defendant's fourth contention is that the defendant's arrest was the direct result of an invalid *Terry* stop (*Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868), and therefore the arrest should have been quashed and the resulting evidence suppressed.

■■ A police officer has the right to stop and interrogate a person if he is able to point to specific and articulable facts when taken together with rational inferences from those facts, reasonably warrant the stopping of the citizen because he is suspected of having committed a crime or of being about to commit one. (*People v. Basiak* (1977), 50 Ill. App. 3d 155, 365 N.E.2d 570; *Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868; Ill. Rev. Stat. 1977, ch. 38, pars. 107—14, 108—1.01.) Such a stop may be made for the purpose of investigating possibly criminal behaviour even though there is no probable cause to make an arrest. *People v. Basiak* (1977), 50 Ill. App. 3d 155, 365 N.E.2d 570; *People v. Blakes* (1977), 55 Ill. App. 3d 654, 370 N.E.2d 869; *Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 889, 88 S. Ct. 1868.

In the present case, Officer Mitchello observed a speeding car fleeing from a pursuing police officer. When he caught up with them, both cars had been abandoned. He then searched the immediate area and saw the defendant who, upon seeing him, tried to evade him. Considering all of these factors, we find that the stop was justified. Compare *People v. Berry* (1977), 54 Ill. App. 3d 647, 370 N.E.2d 26; *People v. Basiak* (1977), 50 Ill. App. 3d 155, 365 N.E.2d 570; *People v. Gatheright* (1976), 43 Ill. App. 3d 922, 357 N.E.2d 597, *appeal denied* (1977), 65 Ill. 2d 582.

## V.

■■ The defendant's last contention is that the prosecutor's argument that the jury had the power but not the right to acquit the defendant was

reversible error. The State concedes the statements were improper but contends they were not so prejudicial as to warrant reversal. We agree. As we recently held in *People v. Rosario* (1979), 74 Ill. App. 3d 607, 393 N.E.2d 543, a case will not be reversed even though the prosecutor's remarks in closing argument went beyond the scope of fair comment unless the remarks constituted a major factor in the defendant's conviction or unless the verdict would have been different had the improper closing argument not been made. In light of the nature of the remarks made, and the fact that the evidence against the defendant was strong, we do not believe that the remarks complained of affected the outcome of the case.

For the foregoing reasons the conviction and judgment appealed from are affirmed.

Affirmed.

JIGANTI, P. J., and LINN, J., concur.