LANCE E. FONTANNE, Adm'r of the Estate of Kathy G. Fontanne, Deceased, Plaintiff-Appellee, *v.* FEDERAL PAPER BOARD COMPANY, INC., Defendant-Appellant.

First District (4th Division)    No. 81-731

Opinion filed March 25, 1982.—Rehearing denied April 26, 1982.

John C. Doyle and Joseph J. McDonough, both of Kralovec, Marquard, Doyle & Gibbons, Chartered, of Chicago, for appellant.

Mullen, Clancy & Associates and Katz, Friedman, Schur and Eagle, Chartered, both of Chicago (Thomas A. Clancy, of counsel), for appellee.

JUSTICE ROMITI delivered the opinion of the court:

The plaintiff as administrator of his wife's estate recovered from the defendant after the tractor-trailer loaded by defendant and driven by plaintiff and his wife overturned, killing her. Defendant appeals, contending:

(1) the deceased was guilty of contributory negligence as a matter of law because Federal regulations put the duty on the driver to be sure the cargo was properly distributed and adequately secured;

(2) the trial court erred in instructing the jury on recovery under the Wrongful Death Act (Ill. Rev. Stat. 1975, ch. 70, par. 2), because the husband was gainfully employed;

(3) the court erred in allowing a high-school dropout to testify as an accident reconstruction expert although he has been an accident reconstruction expert for over 18 years and had testified in over 3,000 cases;

(4) the trial court erred in allowing that witness to testify as to the length of marks in the roadway as determined by him from photographs in evidence;

(5) the trial court erred in refusing to strike the testimony of plaintiff's economist relative to the number of hours expended in a given day, week or month by a typical housewife working outside the home and the dollar value of said service since deceased was no ordinary working housewife;

(6) the trial court erred in allowing an eyewitness to the accident to testify that in response to plaintiff's statement that he did not know how the accident had happened, the witness had told the plaintiff "it shifted";

(7) the trial judge after the jury had been deliberating over seven hours erred:

    (a) in not giving a *Prim* instruction although the jury said they believed they were close to a verdict;

    (b) in telling the jury he would give it "another twenty minutes or so," there being no objection to this statement;

    (c) in allowing the jury to report, voluntarily, that it had resolved liability but needed more time to discuss damages;

    (d) in extending the time for deliberation after this communication, although this extension was not communicated to the jury;

(e) in not declaring a mistrial when the privacy of the jury's deliberations was breached by communication to the court of the status of those deliberations.

We find that the case was fairly and properly tried and that no error existed, or if there was any error in the admission of testimony, such was not prejudicial error.

While defendant has contended that the case should not have gone to the jury, it does not contend that the verdict is against the manifest weight of the evidence. Accordingly, neither a detailed nor a comprehensive discussion of the occurrence testimony is required. The plaintiff, Lance Fontanne, was born on May 22, 1949; the deceased, Kathy Fontanne, was born on July 24, 1951. They were married on July 24, 1971. When they were first married, she worked as a secretary for J & M Electronics. Afterwards she worked for the International Brotherhood of Electricians. She was a high school graduate and had also taken a course in accounting.

In 1975 they became interested in becoming partners as a truck-driving team. They entered into a lease agreement for the purchase of a tractor. They were to receive title to the tractor around October 1977. They began driving in May 1975 and averaged 14,000 miles a month. He was paid 10¢ a mile and she was paid 6¢ a mile for every mile the truck was driven regardless of which one was doing the driving.

After Kathy became a truck driver with her husband, she spent 28 or 29 days on the road. Even then, she took care of the lawn most of the time and did everything in the house such as cleaning and washing, preparing meals, and cutting plaintiff's hair. She handled the family finances. She also sewed most of her own clothes. She was very thrifty and probably spent only $25 a week on herself and her personal needs; she wanted to put as much as she could in the bank. They had joint checking and savings accounts; she also had a savings account in her own name. They were purchasing a house under a mortgage.

On March 2, 1976, they went to defendant's plant in Richmond, Virginia, to pick up a load of paper products bound for Denver, Colorado. Defendant is a manufacturer of paperboard products. They had to wait about 1½ hours before pulling into a dock area. Once a dock area was open, plaintiff backed the tractor into the dock, went up on the dock and told them he was picking up the load for Denver. He was immediately instructed to go to another office about 300 feet away to take care of the paper work. That office was not visible from the dock. Plaintiff and deceased went to that office, where they made certain necessary telephone calls in connection with the shipment and completed the paperwork.

Robert McCrone, the dock supervisor, testified by evidence deposition that it took between one and two hours to load the truck. The paper

products rested on skids that each weighed close to one ton. They were anywhere from 34 to 36 inches in width and 48 to 60 inches in length. They were 50 inches high. There were 17 skids in the load. Although the truck could legally carry about 44,000 pounds, the total weight of this load was 36,000. While several witnesses described the placement of the skids in the truck it is unclear just how they were placed since the witnesses generally referred to photographs of the skids and diagrams which were introduced into evidence; none of these were part of the record on appeal. It does seem clear that the last skid went across the rear of the truck from the left side to the right side. McCrone admitted that the skids were not nailed or connected to the floor or sides of the truck and no boards were used in the empty spaces.

When plaintiff got back to the truck they were just putting the last skid in. He asked for a board or piece of wood to put at the rear of the first set of double skids and a piece of wood on either side of the last skid. He had a hammer and nails with him. They told him "No, we don't have anything like that around here, and we have got a lot of trucks to load, you have got to take off. We need the dock space, just bring it out there in the yard." Raymond Lescault, the defendant's manager, testified that if a driver were to request a piece of wood to block a load, defendant would endeavor to find him one as there were a number of places around the plant where wood was available. However, McCrone testified that they did not have pieces of wood to bind, secure or wedge in against the walls or back of the truck.

Plaintiff upon returning to the dock peered into the back of the truck. At this time he was standing at the dock; that was the same level as the bed of the truck. If he stood to the side he could see beyond the last skid since it did not run all the way to the sides of the truck. Also he could see along the top of the skids. Lescault testified that normally the trucks were loaded before the drivers got there. They looked at already-loaded trucks and inspected the load by just looking at it from the back. Lescault agreed that anything other than a look in from the rear would be impracticable. Very few drivers were going to crawl up on to a load and crawl to the front and look down. The major objection would be the clearance of the load that they would be crawling over and through. Lescault further stated a driver looking in from the back would see what looked like a safe, balanced load. Plaintiff likewise testified he did not notice anything unusual or hazardous about the condition of the load when he looked into the rear of the trailer.

After being told to leave the dock, he pulled the truck out about 100 feet. He then made a safety check of the vehicle and they left. There were no scales at the plant, although many paper companies have them, so he drove about 15 miles to a certified public scale. The load was not

balanced, so he had to adjust the trailer tandems to put more weight on the back of the trailer.

At 7:30 a.m. on March 3, 1976, they stopped for breakfast in Indiana. They shared breakfast with another over-the-road driver, Morris Chapman. After breakfast, they decided to follow each other for a while. At the time of the accident, Chapman was following plaintiff.

About 30 feet preceding a particular curve, plaintiff, who was driving, noticed a sign indicating a speed of 40 m.p.h. (The previous speed had been 55 m.p.h. but he had actually been going 42 m.p.h.) When he saw the sign he took his foot off the accelerator, put very slight pressure on the brakes and shifted downward. As he approached the curve he felt a small bump; it felt like it was in the tractor-trailer unit. He continued to keep slight pressure on the brakes. His speed would have been somewhat slower than 39 m.p.h. As he started to approach the very beginning of the curve he started to turn the steering wheel. As he touched the wheel, he felt a very heavy jar and a lean to the right. The truck then started to lean hard to the right. The trailer tilted more as it went into the turn and flipped over. Just before the trailer hit, the tractor also flipped over on the passenger side door. Kathy, who had been in the passenger seat, was thrown out and crushed to death.

Chapman had been driving behind the tractor-trailer. As it rounded the curve he noticed that two of the wheels were coming about one foot off the pavement. The trailer rode approximately 30 feet in this position; the tractor very much intact. The trailer at the top burst open in the center. The trailer then turned over. The tractor wanted to stay upright but finally was pulled over by the trailer. Chapman pulled up beside it, jumped out of his truck and helped plaintiff out of the tractor. He told plaintiff his wife was dead. Plaintiff said he could not understand what happened. Over objection, Chapman testified he responded "it shifted."

Both sides produced accident reconstruction experts, both testifying as to whether the skids moved and caused the tractor-trailer to overturn. An economist also testified for plaintiff as to value of the homemaker services of a working wife. The jury found for the plaintiff in the amount of $375,000. It answered a special interrogatory finding that deceased was not contributorily negligent.

## I

The United States Department of Transportation provides in its regulations that:

§392.9 Safe loading.

(a) General. No person shall drive a motor vehicle and a motor carrier shall not require or permit a person to drive a motor vehicle unless—

(1) The vehicle's cargo is properly distributed and adequately secured as specified in §§393.100—393.106 of this subchapter.

(b) Drivers of trucks and truck tractors. Except as provided in paragraph (b)(4) of this section, the driver of a truck or truck tractor must—

(1) Assure himself that the provisions of paragraph (a) of this section have been complied with before he drives that vehicle;

❋ ❋ ❋

(4) The rules in this paragraph do not apply to the driver of a sealed vehicle who has been ordered not to open it to inspect its cargo or to the driver of a vehicle that has been loaded in a manner that makes inspection of its cargo impracticable."

Defendant contends that under this regulation the duty was on plaintiff, not on the defendant, to properly load the vehicle and to properly secure the load, and if the cause of the tractor's overturning was a shifting of a load due to improper loading, plaintiff was guilty of contributory negligence as a matter of law. It is undisputed that the plaintiff and deceased were joint venturers so any negligence of his would be imputed to the deceased, and the jury was so instructed. The jury was also instructed that any negligence of plaintiff as the only heir would bar his recovery.

As this court has repeatedly held, the issue of contributory negligence is ordinarily and preeminently one of fact for the jury to determine. (*Duhl v. Nash Realty Inc.* (1981), 102 Ill. App. 3d 483, 429 N.E.2d 1267; *Borus v. Yellow Cab Co.* (1977), 52 Ill. App. 3d 194, 367 N.E.2d 277.) The violation of a safety statute, ordinance or regulation having the force of law is *prima facie* evidence of negligence. (*Davis v. Marathon Oil Co.* (1976), 64 Ill. 2d 380, 356 N.E.2d 93.) It is not negligence *per se*, however, for the evidence of negligence may be rebutted by proof that the party acted reasonably under the circumstances, despite the violation. *Davis; Tabor v. Tazewell Service Co.* (1958), 18 Ill. App. 2d 593, 153 N.E.2d 98, *appeal denied* (1959), 15 Ill. 2d 613.

The regulation relied upon here stated it did not apply if the vehicle had been loaded in a manner that made inspection of its cargo impracticable. Lescault, defendant's traffic manager, testified that anything more than a look in from the rear would be impracticable and very few drivers would crawl up over the cargo to inspect. Accordingly, the jury could reasonably determine that the regulation was inapplicable.

■■ But even if it determined the regulation was applicable, it could still have found the plaintiff's conduct reasonable under the circumstances.

Lescault testified that looking in from the rear one would see what looked like a safe, balanced load. Plaintiff could look in at the load from the dock since it was at the level of the bed; common sense indicates that if he was standing on the ground he could not see over the skids. Yet, defendant hurried him away from the dock and also refused to give him any wood although he had hammer and nails. The regulation was introduced into evidence, and the jury was properly instructed that if they found plaintiff violated the regulation set forth, it might consider that fact together with other facts and circumstances in evidence in determining whether plaintiff was negligent before or after the time of the occurrence. *Davis v. Marathon Oil Co.* (1976), 64 Ill. 2d 380, 356 N.E.2d 93.

## II

At trial, defendant objected to the instruction informing the jury what to consider in determining the amount of recovery because one of the items listed was "what she earned or what she was likely to have earned in the future." On appeal defendant contends that the instruction should not have been given because there was no evidence produced at trial to support any contention that plaintiff was in any way dependent on deceased for monetary support.

Section 2 of the Wrongful Death Act (Ill. Rev. Stat. 1975, ch. 70, par. 2) provides:

> "§2. Every such action shall be brought by and in the names of the personal representatives of such deceased person, and, except as otherwise hereinafter provided, the amount recovered in every such action shall be for the exclusive benefit of the surviving spouse and next of kin of such deceased person and in every such action the jury may give such damages as they shall deem a fair and just compensation with reference to the pecuniary injuries resulting from such death, to the surviving spouse and next of kin of such deceased person.
>
> ❊ ❊ ❊
>
> The amount recovered in any such action shall be distributed by the court in which the cause is heard or, in the case of an agreed settlement, by the circuit court, to each of the surviving spouse and next of kin of such deceased person in the proportion, as determined by the court, that the percentage of dependency of each such person upon the deceased person bears to the sum of the percentages of dependency of all such persons upon the deceased person."

■■ The first paragraph quoted governs the recovery against the tortfeasor by the administrator of the estate. There is nothing in this paragraph requiring the administrator or any other person to be *dependent* on the

deceased. It does require compensation to be based on the *pecuniary injuries* resulting from the death. (*Saunders v. Schultz* (1960), 20 Ill. 2d 301, 170 N.E.2d 163.) There is a rebuttable presumption of substantial pecuniary loss to a spouse or lineal descendants (*Freehill v. DeWitt County Service Co.* (1970), 125 Ill. App. 2d 306, 261 N.E.2d 52, *appeal denied* (1970), 44 Ill. 2d 586; *Dodson v. Richter* (1962), 34 Ill. App. 2d 23, 180 N.E.2d 505, *appeal denied* (1962), 24 Ill. 2d 627; *Robertson v. White* (1956), 11 Ill. App. 2d 177, 136 N.E.2d 550, *appeal denied* (1956), 9 Ill. 2d 628), and the jury was properly so instructed. (*Flynn v. Vancil* (1968), 41 Ill. 2d 236, 242 N.E.2d 237.) In such instance, whether they are in the habit of claiming and received pecuniary assistance from deceased is immaterial in an action for wrongful death. *Dodson v. Richter* (1962), 34 Ill. App. 2d 22, 180 N.E.2d 505, *appeal denied* (1962), 24 Ill. 2d 627.

■■ The paragraph relied on by the defendant does not apply to suits against tortfeasors. Rather it governs the distribution of whatever amount is recovered in the tort action. It changed the mode of distribution so as to prevent, for example, an adult child in no way dependent on a parent from sharing equally with minor children who were fully dependent upon the parent. (*Rust v. Holland* (1957), 15 Ill. App. 2d 369, 146 N.E.2d 82.) But it is not necessary that a person, or even that all the heirs, taken together be 100% dependent on the deceased. (*In re Estate of Griffy* (1978), 64 Ill. App. 3d 504, 381 N.E.2d 755.) As that case stated at 64 Ill. App. 3d 504, 507-08, 381 N.E.2d 757, 758:

> "A careful reading of the statute clearly indicates that the court below was correct in its result and whether or not the appellee was 100 percent or less dependent upon the deceased is irrelevant in the facts of the case before us. The statute talks of proportions; proportions of dependency to the total amount of dependency.
>
> ❋ ❋ ❋
>
> It is also possible for the total percentage to be less than 100 which may be the present case. However, if the father and brother both have no dependency or zero percentage, it is impossible for them to have any proportion if any 'surviving spouse or next of kin' has a dependency."

Here, while it is not relevant to this action, the husband who is the sole heir and sole claimant, has admittedly suffered some pecuniary loss, and his percentage of dependency, however small, is the total amount of dependency.

### III

■■ Defendant objects to plaintiff's use of John Bentley as an accident reconstruction expert because he had no formal education beyond three years of high school and a course of electronics in the Navy; he has never

authored an article or paper in accident reconstruction; and the only course he had ever taught was a one semester evening course in electronics at a two-year college. Bentley had testified as an accident reconstruction expert in 3,000 to 4,000 cases and had been recognized as an expert by appellate courts in such cases as *Mitchell v. Fruehauf* (5th Cir. 1978), 568 F.2d 1139; *O'Kelly v. Jackson* (Tex Civ. App. 1974), 516 S.W.2d 748; *McIlroy v. Wagley* (Tex. Civ. App. 1968), 437 S.W.2d 5, *writ ref'd n.r.e.*; *Kettle v. Smircich* (Tex. Civ. App. 1967), 415 S.W.2d 935.) Before he became an accident consultant in 1964, he had been a deputy sheriff for one year and had served for six years with the Texas Department of Public Safety; during this time he attended both the primary and secondary training academies and took police courses in mathematics and reconstruction of accidents. It is clear in light of Bentley's vast experience and training that the trial court did not abuse its discretion (*Penrod v. Merrill Lynch, Pierce, Fenner, & Smith, Inc.* (1979), 68 Ill. App. 3d 75, 385 N.E.2d 376) in permitting Bentley to testify. Certainly we are not willing to say that only college graduates and college professors can qualify as expert witnesses; knowledge can be acquired by means other than a college education.

IV

■■ Defendant alleges that the court erred in allowing Bentley to testify as to the length of marks on the roadway as determined from photographs in evidence, contending that there was no testimony in the record identifying any specific marks as coming from or being related to the vehicle involved in the accident. This contention must fall because Bentley himself identified various marks in the photographs as coming from the accident vehicle. This court must presume that this identification was both possible and reasonable since the photographs were not included in the record on appeal. It is proper, and indeed customary, for an accident reconstruction expert to testify from photographs coupled with an inspection of the accident scene as Bentley did (*Murphy v. Hook* (1974), 21 Ill. App. 3d 1006, 316 N.E.2d 146, *appeal denied* (1974), 57 Ill. 2d 604; *Plank v. Holman* (1969), 108 Ill. App. 2d 216, 246 N.E.2d 694, *rev'd on other grounds* (1970), 46 Ill. 2d 465, 264 N.E.2d 12; *O'Kelly v. Jackson* (Tex. Civ. App. 1974), 516 S.W.2d 748; *McIlroy v. Wagley* (Tex. Civ. App. 1968), 437 S.W.2d 5, *writ ref'd n.r.e.*; and see *Miller v. Pillsbury Co.* (1965), 33 Ill. 2d 514, 211 N.E.2d 733), since normally an accident reconstruction expert does not visit the scene of the accident until after all marks of the accident have disappeared.

V

■■ The plaintiff called an economist, Geraldine Gage, to testify as to the

value of the deceased's services. In answer to a hypothetical question which included the assumption that after the end of 1977 deceased would work about 40 hours a week, Gage testified that the yearly value of the homemaking services for such an employed married woman was $6,767. In computing this she used two wage rates. One was the wage rate for ordinary housekeeping tasks such as cleaning and laundry. The rate for these tasks was $3.35 an hour. The other component was the managerial aspect, at a wage rate of $5.80 an hour. Defendant did not at this time object to the testimony, but after eliciting on cross-examination that if the hypothetical person was driving an interstate tractor-trailer 28 or 29 days a month, her figures would probably change, defendant moved to strike the testimony. The trial court refused, pointing out that the jury had all the facts and the hourly wages and the defendant could argue to the jury that deceased would only have been working at home three days per month. We agree and find no error.

## VI

Defendant objected to Chapman's testimony that immediately after the accident he told plaintiff the load shifted (actually on direct examination he only stated "it shifted") on the grounds the remarks were hearsay and an opinion the witness was not competent to make. It is not necessary for this court to decide whether the remark was hearsay (compare *People v. Cook* (1965), 33 Ill. 2d 363, 211 N.E.2d 374; *People v. Carpenter* (1963), 28 Ill. 2d 116, 190 N.E.2d 738; *Breslin v. Bates* (1973), 14 Ill. App. 3d 941, 303 N.E.2d 807, which hold out-of-court statements of testifying witnesses who are subject to cross-examination not to be hearsay, with *People v. Spicer* (1979), 79 Ill. 2d 173, 402 N.E.2d 169, *cert. denied* (1980), 446 U.S. 940, 64 L. Ed. 2d 794, 100 S. Ct. 2162, which holds such statements to be hearsay); since even if the remark was hearsay it clearly fell within an exception to the hearsay rule and was admissible as an excited utterance. *Mangan v. F. C. Pilgrim & Co.* (1975), 32 Ill. App. 3d 563, 336 N.E.2d 374; *Burnett v. Caho* (1972), 7 Ill. App. 3d 266, 285 N.E.2d 619, *appeal denied* (1972), 52 Ill. 2d 597; *Perkins v. Chicago Transit Authority* (1965), 60 Ill. App. 2d 431, 208 N.E.2d 867.

■■ Chapman witnessed the accident. As a trucker for 26 years, he was experienced with the nature of trucks and trailers and how they operated. He had driven over 2 million miles. Accordingly, it was proper for the trial court to permit Chapman to testify as to what he told plaintiff immediately after the accident, although in so doing he was stating an opinion he had drawn from his own experience and what he had just witnessed, facts which were fully before the jury. The fact that the tractor was closed and he could not actually see the load shift was also before the

jury and went only to the weight of the evidence. *Birnbaum v. Kirchner* (1949), 337 Ill. App. 25, 85 N.E.2d 191, *appeal denied* (1949), 403 Ill. 628.

## VII

The jury began deliberating at 12:25 p.m. At 7 the judge indicated he would call the jury out and read the *Prim* instruction (*People v. Prim* (1972), 53 Ill. 2d 62, 289 N.E.2d 601, *cert. denied* (1973), 412 U.S. 918, 37 L. Ed. 2d 144, 93 S. Ct. 2731), and give the jury 30 minutes more to deliberate. Plaintiff objected, and it was then agreed to allow the jury to deliberate until 7:30 p.m., at which time the judge would call the jury out and inquire if it had reached a verdict. He would extend the time another half hour if it indicated it was about to reach a verdict. Defendant raised no objection to this although it still urged that the *Prim* instruction be given. It also stated the jurors should be asked if they were close, and the court agreed to do so.

At 7:30 the court called the jury out. The forelady stated that they had not reached a verdict but she believed they were close to a verdict. The trial judge told them that since they were close to a verdict he would give them another "20 minutes or so" to deliberate and the jury retired. No objection of any kind was made by defendant either to the judge's statements or his failure to give *Prim*.

About 18 minutes later, the bailiff came in and reported the jury indicated they had reached a verdict but had not agreed on an amount yet and were asking for more time; this report was voluntary and not in response to any questioning by the judge. The trial judge indicated to the attorneys that he would give the jury about another half hour; he did not, however, communicate this to the jury. Defense counsel at this time moved for a mistrial contending the extension of time was improper. At 8:20 p.m. the jury came in with the verdict.

■■ It is within the court's discretion to decide how long a jury will be allowed to deliberate. (*People v. Kirk* (1979), 76 Ill. App. 3d 459, 394 N.E.2d 1212, *cert. denied* (1980), 447 U.S. 925, 65 L. Ed. 2d 1118, 100 S. Ct. 3019; *Huwè v. Commonwealth Edison Co.* (1975), 29 Ill. App. 3d 1085, 332 N.E.2d 60.) The judge did not abuse his discretion when at 7:30 he gave the jury "20 minutes or so" to deliberate particularly when it indicated it was close to a verdict; indeed, a refusal to give more time under such circumstances might well have been an abuse of discretion. That the jury was not coerced as defendant contends by the court's granting them 20 minutes or so to reach a verdict is shown by the fact the jury did not reach a verdict in 20 minutes but instead asked for more time.

■■ Likewise since the jury was not deadlocked but indicated that it was close to a verdict, the court did not err in refusing to give the *Prim*

instruction since the main purpose of that instruction is to encourage deadlocked juries to reach an agreement. In any event, the defendant made no objection at that time either to the extension of time or the failure to give the *Prim* instruction. Only after the defendant became aware that the jury had ruled against it and was deliberating on damages did it make an objection to move for a mistrial. A party cannot elect to gamble, hoping that it will win the case and then only when it loses the case complain of some error which allegedly occurred. By not objecting at 7:30 to the errors it now contends happened at that time, it waived them. (*Delany v. Badame* (1971), 49 Ill. 2d 168, 274 N.E.2d 353. *Crump v. Universal Safety Equipment Co.* (1979), 79 Ill. App. 3d 202, 398 N.E.2d 188, *appeal denied* (1980), 79 Ill. 2d 630; *People ex rel. Barrett v. Board of Commissioners* (1973), 11 Ill. App. 3d 666, 297 N.E.2d 307.) Likewise the defendant cannot now complain that the court asked the jurors whether they were close to a verdict since it requested the court to make the inquiry. *Esderts v. Chicago Rock Island & Pacific Railroad Co.* (1966), 76 Ill. App. 2d 210, 222 N.E.2d 117, *cert. denied* (1967), 386 U.S. 993, 18 L. Ed. 2d 339, 87 S. Ct. 1309; *Miller v. Scandrett* (1945), 326 Ill. App. 631, 63 N.E.2d 252.

■■ We know of no Illinois case holding that it is error for a trial judge to receive openly a voluntary communication from the jury and defendant has cited none. Furthermore, as we held in *People v. Kirk* (1979), 76 Ill. App. 3d 459, 394 N.E.2d 1212, *cert. denied* (1980), 447 U.S. 925, 65 L. Ed. 2d 1118, 100 S. Ct. 3019, it is not reversible error for a court to discover how a jury is divided. Likewise we are unaware of any case, and again defendant has cited none, which holds it is error not to immediately declare a mistrial simply because the jury goes beyond a deadline set by the court. As already stated, the length of time for jury deliberation rests in the sound discretion of the judge. A refusal to declare a mistrial simply because the jury has continued deliberating past some arbitrarily set deadline when it is clear the jury is close to a verdict cannot be considered an abuse of discretion.

It is clear from the record that defendant received a fair trial and that no prejudicial error was committed. More the defendant was not entitled to. The judgment of the trial court is affirmed.

Affirmed.

JOHNSON, P. J., and LINN, J., concur.