KATHLEEN CIOLINO, Adm'x of the Estate of Beatrice Lynch, Deceased, Plaintiff-Appellant, v. MORRIS BERNSTEIN *et al.*, Defendants-Appellees.

First District (3rd Division)   No. 1—90—3471

Opinion filed June 17, 1992.

Terrence E. Leonard, of Chicago, for appellant.

Timothy A. Weaver, of Pretzel & Stouffer, Chartered, of Chicago (Robert Marc Chemers and Robert J. Franco, of counsel), for appellee Thomas L. Marvelli.

Wildman, Harrold, Allen & Dixon, of Chicago (Leonard S. Kurfirst and Mary Elisabeth Ruether, of counsel), for appellee Morris Bernstein.

PRESIDING JUSTICE GREIMAN delivered the opinion of the court:

In this medical malpractice action, plaintiff Kathleen Ciolino, administratrix of the estate of Beatrice Lynch, deceased, appeals from a judgment entered in favor of defendants, Drs. Morris Bernstein and Thomas Marvelli, after a favorable jury verdict.

Plaintiff asserts two issues regarding Dr. Bernstein: (1) whether the trial court abused its discretion in excluding evidence showing that Dr. Bernstein could have found an intensive care unit (ICU) bed for decedent by moving another patient then in the ICU, and (2) whether the trial judge improperly coerced the verdict by directing the jury to continue deliberations after the jury indicated on four occasions that it was deadlocked as to Dr. Bernstein. As to both Drs. Bernstein and Marvelli, plaintiff submits that the jury verdict was against the manifest weight of the evidence.

For the reasons which follow, we affirm.

At 4:05 a.m. on Sunday May 3, 1981, plaintiff's decedent, 49-year-old Beatrice Lynch, arrived at the emergency room of Northwest Hospital (now known as Our Lady of the Resurrection Medical Center) complaining of pain in her chest and left arm. Dr. Marvelli was in charge of the emergency room and attended to decedent. He took a history, performed some tests including an electrocardiogram (EKG), ordered other tests, and put decedent on an electric monitor. Dr. Marvelli also ordered nitroglycerine for decedent's chest pain and Valium for her anxiety.

At 5:05 a.m. Dr. Marvelli called Dr. Bernstein, who had treated decedent in the past but had not seen her in four years. Both doctors agreed that decedent should be sent to the ICU. However, during this telephone conversation, a nurse informed Dr. Marvelli that no ICU bed was available, all such beds being then occupied. Dr. Bernstein then issued an order to have decedent admitted to a monitored bed.

At 5:30 a.m. a nurse notified Dr. Bernstein that no monitored beds were available. Dr. Bernstein then ordered that portable cardiac rhythm strips be taken every four hours, decedent be put in a bed next to the nurses' station equipped with a "crash cart" including certain necessary equipment, and that decedent be checked frequently.

At 5:50 a.m., while on his way to the hospital, Dr. Bernstein called and spoke with the fourth-floor nurse who advised him that decedent was now in room 410, which is located next to the nurses' station, and that decedent was having chest pain, but no shortness of breath. Dr. Bernstein ordered the nurse to give decedent Demerol, re-

newed his order for a monitored bed, and told the nurse to be sure to do the rhythm strips. At 5:55 a.m. decedent was given Demerol.

At 6 a.m. decedent became cyanotic. At 6:02 a.m. a nurse called the code 99 emergency team, who defibrillated decedent at 6:05 a.m. Decedent went into a coma about 6:20 a.m., having sustained severe and irreversible brain damage.

At 6:55 a.m. decedent was transferred to the ICU, where she remained in a coma until she died on October 22, 1982, approximately 1½ years later.

Thereafter, plaintiff filed this medical malpractice action against the two doctors (Bernstein and Marvelli) and the hospital. Before trial, the hospital and plaintiff reached a settlement.

At trial, two experts appeared on behalf of plaintiff, Drs. Peter Rosen and Gerald Gordon. According to Dr. Rosen, the orders given to admit decedent to an ICU or, alternatively, a monitored bed conformed with the standard of care, but the admission of decedent to an unmonitored bed was a deviation from the standard of care. Dr. Rosen acknowledged that Drs. Bernstein and Marvelli could not do anything to prevent the occurrence of decedent's myocardial infarction.

Dr. Gordon stated that Dr. Marvelli deviated from the standard of care by failing to give decedent oxygen and sufficient pain medication, and by incorrectly interpreting and relaying clinical data to Dr. Bernstein. He testified that Dr. Marvelli had an obligation to know where his patient was going after leaving the emergency room, but that Dr. Bernstein as the attending physician was "the ultimate decider of where the patient goes."

Dr. Gordon also testified that Dr. Bernstein deviated from the standard of care by ordering rhythm strips every four hours in the absence of a cardiac monitor. However, he conceded that a monitor alone would not have prevented decedent's cardiac arrest and that even where a monitor is used, its purpose in discovering a pre-arrest situation is often not achieved because the monitor readings are either missed or misread.

Plaintiff sought to introduce evidence concerning Sue Garber, who was Dr. Bernstein's patient and who occupied a bed in the ICU at the time decedent was being treated in the early morning hours on May 3, 1981. Plaintiff offered Garber's medical records to show that Garber was Dr. Bernstein's patient, that Dr. Bernstein had the option of moving Ms. Garber out of the ICU to make room for decedent, and that Ms. Garber was actually transferred out of the ICU shortly after decedent went into a coma.

Defendant objected and moved *in limine* to exclude evidence relating to the care of Sue Garber. The trial court sustained the objection and allowed defendant's motion on the basis that plaintiff acknowledged she had not laid a foundation for such evidence with her expert and did not intend to provide expert testimony that the failure to move Ms. Garber to provide an ICU bed for decedent violated the standard of care.

Subsequently, Dr. Gerald Menaker, an expert on behalf of Dr. Bernstein, testified that the standard of care did not mandate that decedent be admitted to the ICU or be kept in the emergency room. Dr. Menaker opined that in light of the information Dr. Bernstein had at 5:30 a.m. regarding the unavailability of a monitored or ICU bed and the condition of decedent, which was then noted as stable, Dr. Bernstein acted within the standard of care by ordering that decedent be transferred to a room adjacent to a nursing station where a nurse and a crash cart would be immediately available. He observed that the orders given by Dr. Bernstein at 5:30 a.m. complied with the standard of care "[b]ecause in effect the patient was monitored probably as well as she could have been monitored under the other circumstances. Maybe even better, because the nurse was right there and all the equipment was right there." Dr. Menaker also testified that decedent's myocardial infarction was neither preventable nor predictable.

Dr. Terrence Carden gave expert testimony on behalf of Dr. Marvelli. Dr. Carden testified that Dr. Marvelli's management of decedent "conformed with the standard of care in every way" and was certainly reasonable. He noted that Dr. Marvelli did not have admitting privileges at Northwest Hospital and did not have authority to transfer a patient from the emergency room to a floor in the hospital. Dr. Carden further testified that, even though no ICU bed was available, decedent should not have been kept in the emergency room unless "there was a designated observation area which there wasn't." Also, Dr. Carden testified that the myocardial infarction suffered by decedent was not preventable.

Both Drs. Bernstein and Marvelli testified to the sequence of events as outlined above and that their respective treatment of decedent did not violate the standard of care.

The jury began its deliberations on Friday afternoon, June 1, 1990, and reached its verdict on the following Tuesday morning. During its deliberations, the jury sent four notes to the trial judge indicating its inability to agree on a decision for Dr. Bernstein. The trial judge responded to the jury's notes by requesting that it continue de-

liberations on the evidence and instructions presented. The jury then entered not guilty verdicts for both Drs. Bernstein and Marvelli.

Plaintiff first asserts that the trial court abused its discretion in granting Dr. Bernstein's motion *in limine* to exclude evidence concerning Sue Garber. Plaintiff argues that the proffered evidence on Sue Garber and her condition was relevant to the issue of whether or not Dr. Bernstein breached the standard of care by failing to admit decedent to the ICU because Dr. Bernstein could have moved Sue Garber out of the ICU to accommodate decedent.

Dr. Bernstein responds that the evidence regarding Sue Garber was properly excluded because: (1) the evidence was irrelevant, and (2) plaintiff failed to lay the foundation necessary to allow the admission of the material relating to Ms. Garber.

The grant or denial of a motion *in limine* is a matter within the trial court's discretion. (*Moore v. Bellamy* (1989), 183 Ill. App. 3d 110, 115, 538 N.E.2d 1214.) The threshold question in ruling on a motion *in limine* is whether the rules of evidence require exclusion of the subject matter of the motion. *Moore*, 183 Ill. App. 3d at 116.

The plaintiff in a medical malpractice action must establish through expert testimony the standard of care by which the defendant's conduct is to be measured, that the defendant deviated from this standard of care, and that defendant's conduct caused injury to the plaintiff. (*Mazzone v. Holmes* (1990), 197 Ill. App. 3d 886, 899, 557 N.E.2d 186.) The only exception to this rule is known as the "common knowledge" exception, which applies where " 'the physician's negligence is so grossly apparent or the treatment so common as to be within the everyday knowledge of a lay person.' " *Mazzone*, 197 Ill. App. 3d at 899, quoting *Purtill v. Hess* (1986), 111 Ill. 2d 229, 242, 489 N.E.2d 867.

In the present case plaintiff clearly had the opportunity through the testimony of her experts, *i.e.*, Drs. Rosen and Gordon, to lay a foundation for the admission of evidence concerning Sue Garber and her connection to the standard of care by which Dr. Bernstein's conduct would be measured. Plaintiff conceded the lack of a proper foundation and the total absence of any expert testimony that the standard of care was breached by not transferring Sue Garber out of ICU.

When plaintiff's counsel attempted to have Sue Garber's medical records admitted, he acknowledged that he had no evidence that Dr. Bernstein breached the standard of care by not moving Sue Garber, that he would attempt to explore this issue "through Dr. Bernstein," although "Dr. Bernstein would not have testified to that."

We find that plaintiff failed to satisfy the *Mazzone* standard because she offered no expert testimony to support the theory that the standard of care required Dr. Bernstein to consider the condition of other patients he was attending to determine if such ICU patient should be transferred to make space available for decedent. Absent a proper foundation for the admission of evidence relating to Sue Garber as to the standard of care, the trial court did not abuse its discretion in excluding this evidence.

Next, plaintiff asserts that the trial judge refused to accept the jury's statements of deadlock and thus improperly coerced a verdict.

On Friday afternoon, June 1, 1990, the jury began its deliberations and failed to reach a decision. Accordingly, the jury was sent home about 4:30 p.m. with instructions to return on Monday, June 4.

On Monday, June 4, about 11:52 a.m., the trial judge received the following note from the jury:

"Your Honor, we the jury feel that Dr. Marvelli is not guilty of these charges. On Dr. Bernstein, we cannot come to an agreement, and at this point we feel we are hung jury. Please advise."

After consulting with the attorneys, the trial judge spoke to the jurors in open court. The foreperson acknowledged that the jurors were still speaking to one another but indicated that in his opinion they were deadlocked. The trial judge then gave a cautionary instruction for a deadlocked jury (Illinois Pattern Jury Instructions, Civil, No. 1.05 (2d ed. 1981)), reasoning that the testimony taken in this case took six to seven days and the jury had deliberated about seven hours. The trial judge then instructed the jurors to have lunch and not to deliberate further until they completed lunch. Plaintiff, on appeal, does not contend that this instruction was coercive.

At 2:15 p.m. on that same Monday, the trial judge received a second note from the jury stating: "We cannot come to a unanimous decision regarding this case. Please advise." The trial judge, with the attorneys present, again spoke to the jurors in open court and requested that they continue deliberations.

At 3:05 p.m. the trial judge received a third note stating: "Deliberations on this jury have concluded." In response, the trial judge sent a note to the jury stating: "Please continue to deliberate on the evidence and the instructions you received in an effort to arrive at a unanimous verdict."

At 4:50 p.m. the trial judge received a fourth note stating: "Your Honor, we are deadlocked at eight to three in our voting." At 5:30 p.m., following discussion with counsel, the trial judge addressed the

jurors and stated: "Given the trial time that we've had in this case, I'd like you to get a good night sleep, come back tomorrow at 9:30."

The next day, shortly before 11 a.m., the jury reached its verdict. The jurors were polled and the verdict was unanimous.

The decision as to the length of time a jury will be kept in deliberation rests within the sound discretion of the trial judge. (*Jarmon v. Jinks* (1987), 165 Ill. App. 3d 855, 866, 520 N.E.2d 783; *Fontanne v. Federal Paper Board Co.* (1982), 105 Ill. App. 3d 306, 317, 434 N.E.2d 331.) Absent an abuse of discretion, this court will not reverse. *Jarmon*, 165 Ill. App. 3d at 866.

The mere fact that the jurors declare their inability to agree does not satisfy the test as to when they may be discharged. (*Huwe v. Commonwealth Edison Co.* (1975), 29 Ill. App. 3d 1085, 1087, 332 N.E.2d 60.) To warrant a discharge, it must appear, considering the length of time the jurors have been deliberating and their inability to agree, that they will never agree. (*Huwe*, 29 Ill. App. 3d at 1087.) Even after a jury has indicated that it is hopelessly deadlocked, the trial judge still has discretion to allow further deliberation and to determine the reasonableness of such deliberation. *Jarmon*, 165 Ill. App. 3d at 866.

■ Sending a jury back for further deliberation does not ordinarily amount to coercion of the verdict. (*Huwe*, 29 Ill. App. 3d at 1087.) The reasonableness of the deliberation period depends on factors such as the length of the trial, the nature or complexity of the case, the volume and nature of the evidence, and the presence of multiple counts or multiple defendants. *Huwe*, 29 Ill. App. 3d at 1087.

■ We find that the trial judge did not improperly coerce a verdict by instructing the jury to continue its deliberations. The jury was presented with two defendants, a seven-day trial, and the testimony of 19 witnesses, including 4 experts. The trial judge received all four notes from the jury in less than a five-hour period of time on the same day, Monday. Given the complexity of the issues raised, the nature of a medical malpractice action, the length of the trial, the volumes of testimony, the presence of two defendants, the experience of the trial judge, the wide latitude afforded a trial judge in determining whether to continue or end the jury's deliberations, and the short time span in which the jury presented its notes, we find no abuse of discretion in the trial court's actions.

Finally, plaintiff asserts that the verdict is arbitrary and unsupported by the evidence because neither Dr. Bernstein nor Dr. Marvelli performed within the appropriate standard of care.

As to Dr. Bernstein, plaintiff contends that he breached the standard because he knowingly sent decedent to an unmonitored bed when he could have left her in the emergency room on a monitor and in the care of the emergency room doctor, who could observe her, read the monitor, and react to emergency situations.

As to Dr. Marvelli, plaintiff contends that he failed to communicate accurate information to Dr. Bernstein and failed to be informed as to where decedent was going upon leaving the emergency room. Plaintiff argues that Dr. Marvelli should have kept decedent in the emergency room until Dr. Bernstein arrived.

In reviewing a jury verdict on appeal, the inquiry is whether the result reached by the jury was one which is reasonable on the facts in evidence, not whether other conclusions might also have been reached. (*Lynch v. Board of Education of Collinsville Community Unit District No. 10* (1980), 82 Ill. 2d 415, 423, 412 N.E.2d 447.) Accordingly, a jury verdict will not be set aside merely because the jury could have drawn different inferences and conclusions. *Coldwell Banker Residential Real Estate Services of Illinois, Inc. v. Jepsen* (1988), 172 Ill. App. 3d 662, 527 N.E.2d 79 (the court declined to disturb the jury verdict because it was supported by reasonable inferences and conclusions drawn from the evidence).

To prevail in a medical malpractice action, the plaintiff must prove the proper standard of care against which the defendant physician's conduct is measured, that the defendant failed to comply with the applicable standard, and that the defendant's lack of skill or care proximately caused the resulting injury. *Addison v. Whittenberg* (1988), 124 Ill. 2d 287, 297, 529 N.E.2d 552, quoting *Purtill v. Hess* (1986), 111 Ill. 2d 229, 241-42, 489 N.E.2d 867.

When considering the evidence in the light most favorable to the appellees and applying the requisite deferential standard of review, we cannot say that the jury's result is unreasonable on the facts in evidence. Accordingly, we find that the jury verdict is not against the manifest weight of the evidence.

Judgment affirmed.

RIZZI and CERDA, JJ., concur.